## DIXIE–VORTEX CO. v. LILY–TULIP CUP CORPORATION.

### No. 212.

Circuit Court of Appeals, Second Circuit.

March 7, 1938.

As Modified on Denial of Reargument April 1, 1938.

Edmund Quincy Moses, of New York City (Joseph H. Milans, of Washington, D. C., and Edmund Quincy Moses, of New York City, of counsel), for plaintiff-appellant.

Hans v. Briesen and Milton C. Weisman, both of New York City, for defendant-appellant.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

This suit for infringement of the Wessman and Stone patent, No. 1,766,420, issued June 24, 1930, resulted in a decree holding 6 claims (76, 77, 149, 150, 156, 165), out of 26 sued on, valid and infringed; 20 were found either invalid or not infringed. The decree also held the Johnson design patent, No. 74,793, invalid; plaintiff's copyright K, No. 16,169, invalid; the registered trademark No. 301,390 Chily Bear not infringed, and the defendant not guilty of unfair competition.

Defendant appeals from that part of the decree holding the 6 claims valid and infringed. This patent is for a machine making paper drinking cups. It contains thirty pages of specifications and 171 claims, 26 of which were in issue below. The manufacture of paper cups has been developed over a period of many years. The type involved in this litigation is a two-piece cup made consisting of a body blank and the bottom blank. The body blank is so shaped that, when its longitudinal edges are overlapped and united by a line of adhesive, the body will be conical. The bottom blank is a disc which is cupped so as to provide it with a flange standing at about right angles to the central round flat portion of the cup bottom.

In the production of such blanks by machinery, no problem was involved, as many patents of the prior art were available for a machinist to set up instrumentalities which would perform the successive operations to make the composite structure. What instrumentalities were selected for use necessarily depended upon the type of cup to be made. Plaintiff's cup was called the Dixie, with the flanged cup bottom so positioned that in the finished cup it will point in an upward direction toward the mouth of the cup. Mechanism for this construction includes a tapered mandrel, upon the smaller end of which a flanged cup bottom is formed and then held in place by suction until the blank of the cup body, provided with appropriate lines of glue, is wrapped around the mandrel and into contact with the flange of the cup bottom. Later the bottom edge of the cup body is rolled in, and this operation in plaintiff's machine must be so conducted as not to affect the bottom in order that the latter shall not be displaced and cause a leaky condition.

· Defendant makes the Gem cup, which is structurally different and requires different instrumentalities for manufacture. In the mechanical construction of defendant's cups, the flanges of the bottom point downwardly and are brought into adhesive connection with the lower part of the body both on the inner and outer face of the flange against which the lower edge of the bottom is folded back and ironed in order to produce a taut condition in the cup bottom, to eliminate wrinkles in the cup flange, and to effect a secure adhesive connection both on the inside and outside of the bottom flange. Therefore, it requires a different type of machine to make defendant's cup.

The patented machine contemplates the formation of the flanged bottom directly upon and against the smaller end of a tapered mandrel, the flanged bottom being held upon the mandrel by air suction.

Defendant's cup bottoms are produced in a die independent of the mandrel. After the flanged bottom has been produced in its die, a plunger advances the formed bottom and deposits it for temporary storage in a recess within the interior of the mandrel where the flanged bottom rests idly until after the cup body has been formed on the outside surface of the mandrel. There is a complete independence in manufacturing the defendant's cup between the cup body and the previously formed cup bottom.

In the patented machine, the operation of forming the cup body around the mandrel involves and includes the application of the gummed edge portions of the body blanks against, upon and around the rearwardly extending flange in the previously formed cup bottom so that the act of forming the cup body on the mandrel is simultaneous with effecting the adhesive union between the cup body and the upstanding flange of the cup bottom. On the other hand, in the defendant's structure, the flanged bottom, after being produced independently of the mandrel, remains deposited within the storage recess in the mandrel so that it can in no wise participate in the formation of the cup during or in connection with the formation of the cup body as is essential in the patented machine. After the body had been made and the mandrel carrying the previously formed cup body is brought to another station, the stored flange bottom is pushed out of its recess into contact, the flange extending forwardly, with the previously shaped body.

When in the plaintiff's machine the bottom is formed on the end of the mandrel

and the body is secured to it simultaneously and by the same means which form the body, the cup structure as such is completed, but it is still essential that the relation between the cup body and the cup bottom shall in no way be disturbed. It becomes important, therefore, in the plaintiff's machine that the means relied upon for curling the bottom edge of the cup body should be such that they in no way affect the previously shaped bottom.

The claims (76, 77) here sued on, found in the margin[1], contemplated cylindrical cups as well as conical cups, but they call for nothing which describes any mechanical instrumentality and only a combination of means followed by functional phrases. No mandrel is mentioned, no mechanism for forming and securing the body around the bottom is referred to, nor what kind of means are mechanically required for curling the bottom edge of the body.

Similar cup products were made by the use of the Luellen patent, No. 1,273,891, of the prior art, consisting of a bottom and a body secured around the bottom, the bottom edge of the body being curled beneath the bottom without affecting the bottom. Mechanism appropriate for making cups of this type is shown in the expired patent No. 1,365,517 to Luellen & Wessman. In this latter patent, disk bottoms are first made and stacked in a feeding tube so there are "means for forming a bottom." The bottom is placed against the end of a mandrel and then the conical cup body is placed upon the mandrel and around the bottom associated therewith, and thereupon the bottom edge of the body which projects beyond the bottom is curled over without affecting the shaped bottom where a complete cup is formed. Thus it is clear that claims 76 and 77 were anticipated by the old Luellen and Wessman patent.

Moreover, claims 76 and 77, requiring "means for forming and securing a body around the bottom," call for one means only and not for two independent functioning means. In plaintiff's patent the means which form the body are the same means which secure it around the bottom. In the defendant's structure, the means which form the body have nothing whatsoever to do with the means by which the bottom is subsequently and at a different station associated with the completely formed bottom. Thus defendant's machine does not include means for forming and securing a body around the bottom in one operation as called for by claim 76 and 77.

The Cooley patent, No. 1,199,160 of the prior art, sufficiently taught the defendant uses of a body forming instrumentality and the body folding mechanism of the patent in suit is virtually the same as the corresponding mechanism shown in the Thompson patent, No. 945,875. There was nothing novel about its folding mechanism, nor is there novelty claimed in the patent in suit with respect to the folding mechanism by which the bottom edge of the body is curled beneath the bottom without affecting the previously shaped bottom. Curling instrumentalities as used in the patent are shown in the Luellen and Wessman patent, No. 1,365,517.

These two claims also provide that the cups are made "without affecting the previously shaped bottom." Original claims 107 and 108 were rejected in the application for the patent on the basis of Cooley's patent and then these words were added and the claims allowed as Nos. 76 and 77. Therefore bottom affecting mechanisms such as is shown in Cooley were definitely excluded from the scope of these claims. Defendant does not use means for turning in the bottom edges of the cup bodies in such a way that they will not affect the previously shaped bottom, but defendant uses instrumentalities wherein the previously shaped bottom is very materially affected by an ironing instrumentality which presses the inturned edge of the body against the interior surfaces of the cup bottom flange and at another station inserts ironing instrumentalities to forcibly act upon the bottom to eliminate the triangular space between the flange and the bottom and the inner wall of the cup body, to iron down the wrinkles of the

[1] 76. In a machine for making paper cups or the like, means for forming a bottom, means for forming and securing a body around the bottom, and means for curling the bottom edge of the body without affecting the previously shaped bottom.

77. In a machine for making paper cups or the like, means for forming a bottom, means for forming a body, and securing the same to the bottom, the bottom being spaced from the lower edge of the body, and means for curling the lower edge of the body beneath the bottom without affecting the previously shaped bottom.

bottom flange, and to perfect the adhesive union between the inside and outside surfaces of the cup flange.

The patent of the prior art (1910) to Thompson, No. 945,876, shows a tapered mandrel, the mechanism for forming the body around the mandrel, the bottom forming mechanism and the bottom curling instrumentalities. The prior patent to Whitney (1913), No. 1,082,836, shows tapered mandrels, the wrapping of the body blanks around these mandrels, the formation of a flanged cup bottom, and the pushing of the cup bottom into place within the cup body and mechanism for turning the bottom edge of the cup bottom. The same instrumentalities are shown in the Taylor patent, No. 1,077,496 (1913), which was a machine for making conical cups. And the Cooley patent, No. 1,199,160 (1916), forms a conical body on a similarly shaped mandrel, wraps the body blank around the mandrel by the use of two folding arms, forms a bottom, positions it within a recess in the forward face of a conical mandrel, and then, when the conical body is in place on the mandrel, pushes the bottom blank out of its recess and into engagement with the lower portion of the body. The bottom edge is then curled.

With this available art any mechanic who desired to manufacture two piece cup machinery could do so without the requirement of inventive thought. Altoona Theatres v. Tri-Ergon Corporation, 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005.

Claim 165[2] is for producing an arcuate glue line. In a two-piece cup-shaped paper vessel, the shape of the paper blank in a tapered cup, must obviously be arcuate just as the shape must be rectangular in making a cylindrical cup. Arcuate blanks for making conical cups were old in the art. It is apparent that the glue lines necessary for an arcuate blank would be a straight up and down glue line to provide the union between the edges of the cup body and an arcuate glue line which is necessary when a flanged bottom—whether the flange bends up or down—is to be adhesively united with the inner surface of a conical cup body.

In the patent in suit, the arcuate blank for a paper cup is brought up to a clamp against a rotatable support. This support remains stationary for a sufficient time to permit the paste roller to impress a straight line of glue along one of the straight edges of the blank which ultimately represents the body seam. Then, as the support rotates the blank, a second independent paste applicator comes into action and applies a line of glue to the blank set in from a shorter arcuate edge of the blank which ultimately becomes the bottom of the conical cup. When these lines of glue have been applied to the blank by the plaintiff's two paste rollers, the blank is fed to the mandrel and is wrapped by the old type of mechanism around the mandrel by an operation which in plaintiff's machine applies the arcuate glue line directly against the flange of a previously formed cup bottom which is positioned on the mandrel and ultimately, as the lateral edges of the blank overlap, result in the formation of the body seam. But there was nothing new in this. The Regan patent, No. 1,187,388, positioned his previously formed cup against the forward face of the mandrel and then, by feeding the body blank to the mandrel and rotating the same, he wrapped the body around the mandrel and around the flanged edges of the bottom and ultimately completed the body seam. The body blank was provided with two divergent lines of paste. Each of these lines of paste is in alignment with the shape of the bottom edge and the side edge of the blank respectively. If Regan were followed in connection with the manufacture of the conical cup, all that would be necessary would be to change the shape of the mandrel appropriate to the conical shape of the product to be made, to change the shape of the body blank, and to have the glue lines follow the edges of the paper blank, exactly as they follow the edges of Regan's paper blank. The idea of applying divergent lines of glue to a paper blank in order that such lines of glue may subsequently participate in forming the paper product to be manufactured was old.

 The claim calls for a tapered mandrel and means associated therewith for forming

2 In a machine for forming paper cups comprising a tapered mandrel and means associated therewith for forming a curved edge blank thereastound into similarly tapered cup body formation, means for furnishing a bottom for said body to complete the cup, and means for treating the body blank, so that the bottom and body will be secured together, comprising a paste applicator adapted to engage the blank prior to its presentation to the mandrel and means whereby the paste applicator will apply a line of paste on the blank in an arc concentric to the arc of the lower edge of the blank which is to encompass the bottom.

a curved edge blank there-around into a similarly tapered body formation, means for furnishing a bottom for said cup body to complete the cup and means for treating the bottom blank so that the bottom and body would be secured together. This was shown in the Cooley patent. This claim, however, requires that the means relied upon to secure together the bottom and the body shall comprise a paste applicator adapted to engage the blank prior to its presentation to the mandrel and that the paste applicator will apply a line of paste on the blank in an arc concentric to the arc of the lower edge of the blank. This claim is invalid, and the suggestion of the court below that the "mere inclusion of an old element with other old elements, does not of itself create doubt as to the validity of this claim" is erroneous. If a patentee has done nothing more than to include an old element with other old elements, the patent is invalid.

Claims 149 and 150[3] provide for an auxiliary air jet to assist in blowing a cup from its mandrel. The claims relate to that part of the plaintiff's machine where after the cup body and bottom have been united and the bottom edge of the body curled, the cup is blown from the mandrel. Instrumentalities used to blow off the cup consist of the customary air jet which blows against the inner surface of the cup bottom and an auxiliary air jet. The auxiliary air jet directs the air through a slit in a vertical upward direction at right angles to the axis of the mandrel. The patent does not disclose where the auxiliary air jet is to be effective with respect to the cup on the mandrel. On one exhibit, the air jet was arranged in a horizontal direction with respect to the axis of the mandrel.

Plaintiff claimed that, without the use of a supplemental air blast, the cup could never be blown from the mandrel. In defendant's machines no auxiliary air jet is used. Experiments had been made to ascertain whether a supplemental air jet might or might not be of advantage. Defendant's factory manager concluded that they were not found to be of any value but rather a hindrance to the work. But experimental use of an auxiliary air jet by the defendant was justified in view of the patent of the prior art to Palmer, No. 1,312,570. Palmer showed an auxiliary air line and shows it in a horizontal position with relation to the mandrel. Palmer says that the use of an additional air blast which he shows "will assist in discharging the article immediately from the form." It is of no importance that Palmer's use was not for a paper drinking cup but for another paper receptacle. The principle and thought are the same. If there be invention in this, Palmer clearly anticipated and these claims are invalid.

Claim 156[4] is for a trip finger automatically giving way to retard the speed of falling cups as they leave the machine. It represents what an ordinary mechanic would think of in obtaining the result desired. Any product ejected from a machine with too great force or at too high speed does damage, and this may be overcome by the obvious method of reducing the speed by interposing a break appliance in the path of the moving object. This claim relates to that part of the machine of the patent in suit called "trip fingers" which are the means near the exit adapted to present a yieldable obstruction in the path of movement of the cup to insure its steady slow delivery. These "trip fingers" do not com-

---

[3] 149. The combination of a cup supporting mandrel having an apertured portion, means for creating a jet of air through said apertured portion to assist in releasing a cup from the mandrel and blowing the same from the mandrel and other means for delivering a jet of air into the open end of the cup between the same and the mandrel to overcome any back or holding current of air working rearwardly between the mandrel and cup from said first mentioned jet.

150. The combination of a cup supporting mandrel having an apertured portion, means for creating a jet of air through said apertured portion to assist in releasing a cup from the mandrel and blowing the same from the mandrel, and means to overcome any back or holding current of air working rearwardly between the mandrel and the cup.

[4] 156. In a machine of the character described, cup forming means and means for delivering the cup from the machine comprising discharging instrumentalities adapted to cause the cups to travel to the pre-determined point of deposit, guiding means in said path of travel, and means near the exit from said guiding means adapted to present a yieldable obstruction in the path of movement of the cup to insure a steady slow delivery of the cup, said last mentioned means after momentarily tending to retard the cup automatically giving way to permit the discharge of the cup.

pletely arrest the movement of the cup, but merely retard its speed, "automatically giving way to permit the discharge of the cup." By these means the cup passes completely out of the cage and onto a moving belt without coming to a position of rest, though at reduced speed due to the "trip fingers" which automatically give way at the impact of a cup.

Defendant's mechanism has no such trip fingers as those of the patent in suit or their equivalent. With the defendant's mechanism, finished cups are blown through a gooseneck which is of the type shown in the old Luellen & Wessman patent, No. 1,365,-517. The finished cups are blown at a high rate of speed through the gooseneck chute, and, as each cup is blown forward, it stacks itself upon cups previously ejected. Immediately after each cup has been deposited on the stack, a mechanism enters the chute and pushes the cup last deposited and with it the whole of the stack forward a short step equivalent to the space between two adjacent flanges and then retreats from the chute to a position out of the path of the next cup to come over. By these means the stock is advanced step-wise by a pusher and, when sufficient cups have accumulated in the stack, an operator removes the forward portion of the stack and deposits them in cartons. This claim is invalid.

The other claims sued on are 89, 101, 102, 104, 107, 108, 109, 110, 111, 114, 142, 143, 144, 147, 151, 152, 153, 154, 155, and 164. Claims 101, 102, 104, 107, 108, 109, 110, 111, 114, 152, and 153 call for a mandrel used in the formation of the cup, the transfer of a cup thus made from the mandrel to another machine, and finally some other operation upon the transferred cup. Sometimes the other operation is a top curling operation. In other claims it is an operation which mechanically unseats the cup or one which blows the cup away, or in other instances nothing is specified about what is done with the cup except that it is moved from one place to another as in claims 102, 104, 108, 109, 152, and 153.

In claim 102 the mandrel is used for the formation of a cup bottom on the end of the mandrel and a cup body is then formed around the preformed bottom on the mandrel, and this claim calls for "means for discharging the cup from the mandrel, a container adapted to receive the cup from the mandrel, and means for discharging the cup from the container." No operation is apparently performed on the cup after it leaves the mandrel. All that the cup does so far as this claim is concerned is to move around in space. The same is true of claim 108, where, after the cup has been made on the mandrel in a particular way, it is made the subject of "means of seating the cup in the container and means for discharging the cup from the container."

By claims 152 and 153 the cup, after being made on the mandrel, is subjected to air means for delivering it to the seat of a container and to fully insert the cup into the seat. These claims illustrate aggregation. The aggregation condition is made apparent by the patent, for it calls attention to the fact that when the cups leave the mandrel, they are finished products which can be blown directly from the mandrel into the carton that goes to the consumer. Whether it goes into a carton, or whether it is transferred to another machine where the cup has its upper edge rolled, has nothing to do with the machine that makes the cup and combines the flanged bottom with the wrapped cup bottom. It thus appears that claims 101, 102, 104, 107, 108, 109, 110, 111, 114, 152, and 153 are invalid because of the rule against aggregation. Moore v. Saunders, 8 Cir., 247 F. 314; Demco v. Doughnut Machine Corporation, 4 Cir., 62 F.2d 23; Doughnut Corporation v. Joe-Lowe Corporation, 4 Cir., 67 F.2d 135, certiorari denied in both cases 288 U.S. 605, 53 S.Ct. 396, 77 L.Ed. 980.

Claim 89 is not infringed because the defendant does not shape the bottom on the mandrel. It does not form the body around the shaped bottom and secure the latter around the former and has no means for curling the bottom edge of the body. The means for turning in the bottom edge in defendant's machine affects definitely and purposely the shaped bottom, whereas in the plaintiff's machine the bottom must not be disturbed by the operation of curling the bottom edge of the cup.

Claim 147 is not infringed by defendant, for it does not employ any means "relatively effecting the actuation of the clamping and turning mechanism."

Claims 89 and 147 refer to clamping the cup on the mandrel during the bottom curling operation. There was nothing new in holding a cup body upon the mandrel against displacement or movement during the period that some operation is performed on the cup. The Cooley patent disclosed this.

Claims 142 and 143, together with claim 147, refer to the bottom curling operation, and the instrumentalities used in the patent in suit for curling the bottom are the same as those employed in the Luellen & Wessman patent, supra. The effect of the use of these instrumentalities is precisely the same as that which is shown in the Luellen patent, No. 1,993,574. The patentee desired to effect a true curling action as distinguished from a folding or creasing action. In the defendant's machine the bottom is made by means which are not associated with the mandrel and defendant's means are disclosed in the Thompson patent. Claims 142 and 143 are not infringed.

Claims 144 and 151 have to do with forming the bottoms. The instruments used were clearly shown in the Cooley patent, supra. Moreover, the defendant does not infringe but operates on the principle of the Cooley patent, where the bottom is formed independently of the mandrel and is pushed into the completed conical body at appropriate stations situate beyond the body forming station.

■ Claims 154 and 155 relate to the means for discharging the cup from the top curling mechanism. Discharging cups from a holder or container by air is well known and is illustrated in the Luellen & Wessman patent. There was nothing novel in the idea as such. Powers-Kennedy Corporation v. Concrete Mixing Co., 282 U.S. 175, 51 S.Ct. 95, 75 L.Ed. 278. Moreover, the defendant did not infringe because it had no "gentle ultimate deposit," since its cups were being blown out with force.

Claim 164 provides for a pair of adjacent paste applicators. This was anticipated by the Regan patent. It is sufficient to hold this claim invalid as anticipated.

Therefore, the court below was right in holding claims 101, 102, 104, 107, 108, 109, 110, 111 and 114 invalid, and claims 89, 142, 143, 144, 147, 151, 154 and 155 not infringed.

■■ The design patent to Johnson, No. 74,793, sued on represents a conventional decoration. The patent does not point out any particular feature of novelty in design so that every element of the design is essential. Ashley v. Tatum Co., 2 Cir., 186 F. 339; American Fabrics Co. v. Richmond Lace Works, 2 Cir., 24 F.2d 365. The design is not original with this patentee. These classical figures, complete in every detail, are shown to have been of great antiquity. They appear in their entirety in the 17th Century design, reproduced in "Historical Guide to French Interiors." It was used in china designs as shown by "The American Pottery Gazette." The detailed construction of the festoons in that they are constituted of successive triangular units, is shown to be old and well known as used on furniture, upholstery, and house decorations.

■ The trade-mark No. 301,390 "Chily Bear" is not infringed by the defendant's "Sunbeam" and "Freezer" cups. The defendant never used the words "Chily Bear" on its product. There is no evidence that the public ever identified plaintiff's cups by reference to the trade-mark "Chily Bear" or that the defendant's cups are purchased on orders calling for "Chily Bear." Defendant's cups are plainly marked "Sunbeam" and "Freezer." There can be no conflict in the public mind between plaintiff's and defendant's product.

■ A copyrighted print No. 16,169 registered with the Register of Copyrights is said to be infringed. It is not a Patent Office copyright but is a Copyright Office copyright, erroneously applied for in the Copyright Office. The plaintiff had no right under the law to register this print in the Copyright Office and failed to register it in the Patent Office, where it should have been registered. It was correctly held invalid below. Section 3 of the Act of June 18, 1874, 17 U.S.C.A. § 63, was not repealed by the Copyright Act of 1909, as amended, 17 U.S.C.A. § 1 et seq. and is still in force and effect. Jeweler's Circular Co. v. Keystone Co., 2 Cir., 281 F. 83, 26 A.L.R. 571.

■ Charges of unfair competition are made against the defendant. They are based upon the grounds that the plaintiff was the first to place the festoon decoration upon its cups, and that no competitor has a right to put it on cups decorated similarly, even though there were prior art types of this design. Plaintiff's design is in no way similar to the defendant's, which chose the use of a necklace. As pointed out below, nobody was deceived or confused and there was no palming off of the defendant's goods for those of the plaintiff. It is asserted that price lists, colored blue and yellow, are used by the defendant and that such colors for price lists have been used by the plaintiff. There was ample evidence that there was use of such colors prior to plaintiff's use. Defendant's lists have been consistent-

ly yellow and blue and, if they mean anything in combination or by way of identifying the source or origin of the merchandise, they indicate the defendant's rather than the plaintiff's product.

Nor can any unfair competition be laid to similar shapes or sizes or cellophane wrapping or colors of the packaged cups. Moreover, these were used by others prior to plaintiff's use. Other claims of alleged unfair competition such as a label on the 5 and 10 cent packages, the type of paper used for making the cups, and the stock numbers were all well known in the trade and in no way identified the plaintiff's product.

The dispensers used by the defendant form no basis for an unfair competition charge. No one would be confused in the purchase of cups merely because of the use of a similar dispenser. In all this record evidence of confusion of the public as to the origin of the two products is absent and the witnesses called justify the defendant's claim that there was no such confusion.

The decree will be reversed in so far as it holds 6 claims valid and infringed and otherwise affirmed.

Decree modified.