### LEVOY v. STYL-RITE OPTICAL CORPORATION.

### LEVOY v. IDEAL OPTICAL CO., Inc.

#### Civ. Nos. 8624, 8625.

United States District Court
E. D. New York.

Dec. 7, 1949.

Bondy & Schloss, New York City, attorneys for plaintiff, Norman P. S. Schloss, New York City, of counsel.

George M. Glassgold, New York City, attorney for defendants, Irving F. Goodfriend, New York City, of counsel.

KENNEDY, District Judge.

In this suit plaintiff seeks treble damages against the defendants because, as he claims, they have not only infringed a design patent issued to him,[1] but also that their infringement has been wilful and deliberate.[2]

The plaintiff has been in the spectacle frame business for many years both as a distributor and as a manufacturer. He testified that in early June of 1946 he experimented with a plastic frame, his object being to make it seem more beautiful than it was. Underlying the experiment was the idea that contrasting material could be added to the frame. Plaintiff used adhesive tape (plaintiff's exhibit No. 13) as a substitute for the material which eventually he intended to add to the frame in order to accomplish his purpose. Experimentation was necessary, according to the plain-

---

1. Design patent # D 147,368 issued August 26, 1947.

2. 35 U.S.C.A. §§ 67 and 73.

tiff, because what he was attempting to achieve was a correct balance and contrast between the plastic frame itself and the material to be added.

Even at the risk of repetition, it is necessary to make clear what was in plaintiff's mind. Plastic spectacle frames are, of course, in themselves, far from being beautiful objects. Their resemblance to goggles is so close that it is difficult indeed to visualize a face whose beauty they would enhance, but the plaintiff, so he says, borrowed from the "beauticians'" technique, and particularly that portion of beauty treatment which deals with the remodeling of eyebrows and the reasons for this technique. Plaintiff claims that he had learned that there are two standards of beauty accepted among "beauticians", namely, (1) that the eyes should be made to appear as large as possible, and (2) that the nose should be foreshortened to the greatest possible extent. These objects, says plaintiff, are accomplished in a very simple way. The "beauticians" add apparent size to the eye by heightening the eyebrow, in other words, by plucking it at its lowest surface. They also foreshorten the nose, or seem to, by plucking the eyebrows at their interior ends with great artistic judgment so as to leave a space just over the nose wider than that left by nature.

The plaintiff felt that he could design spectacle frames which would accomplish these same purposes by applying lustrous material ("sleeves") along the top surfaces of the frame and by leaving a plastic gap over the bridge of the nose. He also felt that the dull and bulky effect of plastic frames could be reduced by applying a lustrous surface (sleeve) to a portion of each temple piece. Having experimented with adhesive tape placed upon an already known frame (designed previously by himself) plaintiff claims that he finally accomplished true balance and proportion so that the faces of those who would wear his frames would be actually beautified.

As is usual, the design patent ultimately issued to plaintiff makes and need make no "claim" of any kind. And there is controversy in the case concerning whether the sketch itself depicts "lustrous" material, or, in fact, any of the materials shown on the Patent Office chart for draftsmen, 35 U.S.C.A.Appendix, following rule 199.

In any event, plaintiff took his taped frame to a concern called the Metaplast Corporation (called Metaplast) and requested that frames be plated with gold or other metal at the areas indicated by the adhesive tape. It is well to say at this point that plaintiff insisted vehemently at the trial that his arrangement of the plated material must be carried out meticulously— that his formula for beauty was exact. For example, since there is a strip of uncovered (plastic) material over the bridge of the nose, the design is destroyed, according to plaintiff, if there is continuous plating along the top portion of the spectacle frame: there must be a break well beyond either end of the nosepiece showing plastic between that piece and the plating (sleeves) on the top surface, else the nose will not be beautiful. In addition to that, plaintiff pointed out that another integral element of his design is the handling of the plating at the outside surfaces of the eye-pieces where they join the temple pieces. These outside surfaces, says plaintiff, must be plated so that the effect of a slight upward sweep is achieved by bringing the plating to a point just over the hinges of the frame.

After some technical difficulties had been surmounted by Metaplast, sample frames satisfactory to the plaintiff were finally turned out (latter part of July, 1946) and in the same month, prior to the issuance of the patent, the plaintiff traveled to Hollywood where he did what he calls publicity work. This consisted in arriving at some sort of understanding with a motion picture producer whereby photographs might be made of very popular actresses wearing plaintiff's product.[3]

3. While it may be quite irrelevant to the controversy, it is a curious fact that one limitation placed by the motion picture

producer on plaintiff's publicity pictures was that in no case must an actress be shown wearing spectacle frames with

There cannot be the slightest doubt that plaintiff's product met with immediate and widespread commercial success.[4] He did not even complete his trip around the continent, because by the time he reached the south from Hollywood he had already taken orders in excess of the capacity of Metaplast to produce within a reasonable time. Nor can there be the slightest doubt that the defendants actually pirated plaintiff's design. In other words, on the issue of infringement, and wilful and deliberate infringement at that, there is nothing to be said for the case put forth by the defendants.

This leaves only the question whether plaintiff's patent is valid. In the brief submitted in behalf of plaintiff there are set forth 16 specifications which are said to be embodied in the design, all of which, or some of which in combination, make the plaintiff's design unique. But it cannot be denied that the general notion of beautifying plastic frames was old in 1946. The plaintiff, himself, had produced an article which he called the "jeweled spec". This product consisted of a plastic spectacle frame pointed and upswept at the outer ends, studded with tiny colored stones at those ends, and also at the portion of the frame which fitted over the bridge of the nose. It will be observed that under the patent in suit the spectacle frame, unlike "jeweled spec", has a plain plastic surface over the bridge of the nose, and, again unlike "jeweled spec", plaintiff's new product, has overlaid lustrous material along the upper surfaces of the frames and the temple pieces for a portion of their length. It is certainly true, nevertheless, that behind the conception of the "jeweled spec" frames was the general idea, already old, that something should be done to relieve the

severity of plastic frames. Moreover the contour of the two frames, which is one of the elements involved in the patent in suit, is identical with that of "jeweled spec". Oddly enough, "jeweled spec" was a commercial failure; perhaps it was too gaudy.

Plaintiff contends that in spite of the fact that, upon the issuance of the patent, beauty, ornamental value, and novelty are to be presumed, he, on his own case, proved the presence of these elements by the favorable testimony of dealers (citing J. R. Wood & Sons, Inc., v. Abelson's, Inc., 3 Cir., 1934, 74 F.2d 895), and that this proof is enough to sustain the patent. On this point I think that plaintiff is quite wrong. The Court of Appeals of this Circuit has pointed out in Nat Lewis Purses v. Carole Bags, Inc., 2 Cir., 1936, 83 F.2d 475, that patentability depends upon "invention", whether the patent be a design or a mechanical patent. Indeed that very case cites the case of Woods & Sons with what I think is disapproval. At the very least, under Nat Lewis Purses, supra, the notion that nothing more is required if a design be new and pleasing enough to catch the trade is exploded. There must still be the "exceptional talent" required for a mechanical patent. Again in General Time Instrument Corp. v. United States Time Corp., 1948, 2 Cir., 165 F.2d 853, 854, certiorari denied 334 U.S. 846, 68 S.Ct. 1515, 92 L.Ed. 1770, Judge Clark takes it as well settled that a design patent must be the product of invention if it is to be valid and the "novel, ornamental, or pleasing in appearance" formula he specifically discards. There must, says Judge Clark, be revealed a "greater skill than that exercised by the ordinary designer who is chargeable with knowledge of the prior art", in this case the plaintiff Levoy.

---

plain lenses. Sunglasses were acceptable; but to suggest any physical deficiency on the part of the various artistes was quite out of the question.

4. It is a fact that plaintiff was able to consummate profitable license arrangements with a number of concerns, and there was a boom in the trade for plaintiff's frame. In the footnote just preceding this one I mentioned that motion

picture producers were reluctant to permit their people to be pictured wearing the frames with plain lenses. But it is claimed in this case, and I do not doubt it to be true, that many women purchased plaintiff's frame even though they did not need glasses, because of a belief that the frames were beautiful, or at least attracted attention.

500

Supporting their claim of anticipation, the defendants submitted five patents. British patent No. 500,244 certainly shows ornamentation on the temple pieces of a spectacle frame. It cannot be said that an ordinary designer might not be expected to carry this idea forward to ornamentation of the front pieces of the frame, or at least to experiment along such lines. Plaintiff's own earlier product ("jeweled spec"; D. 151, 698, Nov. 9, 1948) shows that that extension of the idea of ornamentation actually occurred. British patent No. 373,-316 is a mechanical (utility) patent relating to spectacle frames, to the metal sides of which are applied tortoise shell covers,[5] analogous at least in appearance (design) to what plaintiff in this case calls "sleeves". United States patent No. 2,155,693 issued April 25, 1939, shows lense loops with slots at the top, capable of being assembled into a top piece. Inevitably, this would give the effect of a sleeve over the front upper surfaces of the frames.

There was considerable controversy in the record about a frame known as the "Classic", which defendants say anticipated the patent in suit. The idea of contrast between the top of the eye-pieces and the rest of the frame was certainly shown in "Classic" which was depicted and explained on May 1, 1946, in the Optical Journal. True enough, the original "Classic" frame, as shown and as received in evidence, involved the use of paint instead of a metallic sleeve, and the contrasting portion of the eye-pieces was carried to the bridge piece, leaving a smaller space than that shown by the plaintiff's claimed invention. But concerning the last mentioned phase of the matter, the record will plainly show that plaintiff himself was vague concerning the existence of any exact proportion between the uncovered plastic nosepiece and the sleeves at the top of the frame. At one point he seems to say that a change of two or two and one-half millimeters in this open space would make all the difference. At another he seems to modify this statement by intimating that he meant that whatever change was made in one side would necessarily be duplicated in the other.

■ At this point it may be well to remark that throughout the briefs the plaintiff vigorously resists any attempt to break down his claimed invention into its elements and then to consider these elements separately.[6] Plaintiff's claim is that his design is a unit: and that while he, himself, recognizes that it has certain well-defined elements previously known, he seems to take the position that it is improper to attack his patent by the method of analysis. For example, as I have indicated, the contour of the frames was old. And again, surely the idea of contrast is clearly disclosed in the "Classic" advertisement of May 1946, and it would not in itself be invention to substitute a metallic overlay for the painted portion of the "Classic" frame. It seems to me that this drove the plaintiff at the trial into the position that

5. Other like materials are suggested.

6. It is extremely difficult for me to reconcile plaintiff's position with some of the decided cases. The patent in suit (D. 147,368; August 26, 1947) does not point out any particular feature of novelty in design. The cases in this circuit leave very little doubt that under these circumstances *every* element of the design is *essential*. Judge Byers, writing in Forman v. American Exp. Co., D.C.S. D.N.Y.1941, 37 F.Supp. 82, 83, cites on this point Dixie-Vortex Co. v. Lily-Tulip Cup Corporation, 2 Cir., 1938, 95 F.2d 461, 467, and the last-named case at the place indicated certainly does contain an unequivocal statement to that effect, citing, in turn, Ashley v. Samuel C. Tatum Co., 2 Cir., 1911, 186 F. 339, and Ameri-

can Fabrics Co. v. Richmond Lace Works, 2 Cir., 1928, 24 F.2d 365.

In *this* case the prior art surely shows that ornamentation of temple pieces was not novel, yet this is distinctly an element of plaintiff's design. Quaere: under the decided cases in this circuit could plaintiff succeed in a contention that this or any other element, including proportion, can be discarded, and yet the patent be successfully defended against an attack on its validity? I have not attempted to answer this question but rather have taken the approach suggested in Rowley v. Tresenberg, 2 Cir., 1941, 123 F.2d 844 that the patent may lurk "somewhere among the possible combinations which will fit upon the disclosure."

the novel and unique quality of his frame lies in the proportions used. It will, in this connection, be noticed that at the very out-set of the trial plaintiff placed the greatest stress upon this point, even using drawings superimposed on a sketch of a human face to make it clear. But when he attempted to define what these proportions were, it seemed to me, as I have said, that his testimony was so vague as to be completely inconsistent with a claim for a patentable design.[7]

It must be clear that opticians would necessarily stock a wide assortment of frames with varying proportions between the gold sleeves and the open plastic space over the nose bridge. It seems impossible that otherwise they could satisfy the needs of their customers. Harking back to plaintiff's idea of the "beauticians'" standards of beauty, it is ridiculous to suppose that any beauty shop operator works on a fixed arithmetical formula in plucking eyebrows. And in all probability opticians on very many occasions are compelled, in fitting their customers with plaintiff's frame, to make minor changes and modifications to suit the wearer just as a "beautician" or even a lady plucking her own eyebrows uses a trial and error procedure to achieve the desired effect of beauty with the material available. I do not for one moment suggest that a procedure by trial and error is inconsistent with invention. The flash of genius may be kindled even during a laborious process of experimentation. But when I look at the "Classic" design (defendants' exhibit No. L) and consider it along with the other evidence in the case, I feel almost sure about what actually preceded the issuance of the patent in suit. Plaintiff is surely chargeable with knowledge of the advertisement for the "Classic"

frame. Now it is true that the embodiment of the drawing shown in the "Classic" advertisement does not too closely resemble plaintiff's product, largely because paint or coloration used on the top of the eyepieces will not give the same effect as metal laid over those pieces. It is also true, as plaintiff suggests in his brief, that there can be compiled a large list of differences between plaintiff's frame and the "Classic" frame. The latter, moreover, was never shown to have any large commercial success, and indeed the only sales spoken of at the trial were characterized by the plaintiff, perhaps with some basis, as wash sales between the two defendants. Be that as it may, in a black and white *picture* the impression made on the eye, or at least on my eye, by the "Classic" frame is much the same as that made by the picture shown in plaintiff's design patent in this respect: that both employ the basic idea of shading the top of the eye-pieces in such wise as to minimize the goggle effect. It is almost obvious that any technician in the optical business, like plaintiff, picking up the "Classic" advertisement would understand the idea I have spoken of and would experiment until he had reached what he considered the optimum effect. This is exactly what plaintiff did in his application of the adhesive tape to one of the frames in evidence (plaintiff's exhibit No. 13). That the uncovered plastic material over the bridge of the nose was widened seems to me to be a minor innovation which could well be achieved by tinkering with the frame, and that is what I believe plaintiff, in fact, did. The question is whether this is invention— the divine flash—or the product of a skilled technician's routine, and under the facts of this case, as I read them, there can be no doubt what the answer is, namely, that

7. In what I have said, and am about to say, on the question of exact or nearly exact proportions, I have in mind that plaintiff here finally claimed at the trial that his design did embody exact proportions. He said that the frames were put out in sizes customary in the optical trade graded according to the size of the eye, and, further, that in his design the open space between the interior ends of the gold sleeves on the front of the eye-

pieces was equal to the width of one eye. But plaintiff's manner when he injected this bit of testimony and other facts in the case, such as his insistence upon the methods of beauty experts, persuade me that in all probability no such exact proportion exists or could exist. Certainly, the case was not tried on any such theory, nor was there any proof that defendants' product infringed upon a precise ratio between the open space and the sleeves.

502

there was no invention, giving to that term the meaning that I must use under authority so familiar as to need no citation.

 The commercial success of plaintiff's frame, which might be a highly significant factor in a close case, and the brazen copying of plaintiff's product by the defendant in this case, make it clear to me that the highly skilled craftsman is the forgotten man of the patent system, but I must take the law as I find it. I hold the patent invalid.

I have filed findings of fact and conclusions of law. Defendants are entitled to a decree, but without costs.