### FRIEDLEY–VOSHARDT CO. v. RELIANCE METAL SPINNING CO.

#### (District Court, S. D. New York. July 26, 1916.)

1. PATENTS ⊚⇒328—VALIDITY AND INFRINGEMENT—DESIGN FOR SHOWER PAN.
   The Holton design patent, No. 47,244, for a design for a gas and elec-
   tric fixture known as a shower pan, discloses patentable invention; also,
   *held* valid as against the claim that it was not the invention of the
   patentee and infringed.

2. PATENTS ⊚⇒81—VALIDITY—DEFENSE OF PRIOR USE.
   A defense of a prior use, when introduced to invalidate an existing
   patent, must be established by the most convincing evidence.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 104; Dec. Dig.
   ⊚⇒81.]

3. PATENTS ⊚⇒80—VALIDITY—PRIOR SALE AND USE.
   A patent is not invalidated by the public sale and use of the patented
   article at any time within two years before the application was filed, un-
   less abandonment is shown.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 102, 103; Dec.
   Dig. ⊚⇒80.]

In Equity. Suit by the Friedley-Voshardt Company against the Re-
liance Metal Spinning Company. On final hearing. Decree for com-
plainant.

Walter H. Pumphrey, of New York City, and Zell G. Roe, of Des
Moines, Iowa (Harry Lea Dodson, of Chicago, Ill., of counsel), for
complainant.

Munn & Munn, of New York City (T. Hart Anderson, of New York
City, of counsel), for defendant.

AUGUSTUS N. HAND, District Judge. [1] This is a suit to
restrain the defendant from infringing design letters patent No.
47,244 to Holton issued on the 20th day of April, 1915. There is
no doubt that a design patent, like every other, requires invention,

and, if the design in question for a gas and electric fixture known as a shower pan is a mere aggregation of well-known elements which could be assembled without ingenuity or artistic skill, it cannot be regarded as one showing invention. It is to be remembered that ornaments resulting from the varied juxtaposition of curves and angles, like the musical combinations resulting from the sequence of notes and chords, all contain certain intervals—ornaments intervals of space, music intervals of sound—which are traditional and well known. It is difficult, if not impossible, after years of development, to imagine any article of ornament or any production of music of which this is not true. It is in the arrangement, or, to use the technical term of the patent law, the combination, of elements, and probably at this late day in that alone, that originality and æsthetic skill may be evidenced. Mr. Ainsworth, the designer of Caldwell & Co., well expressed this idea when he said in his testimony at the trial:

"* * * All motives are old. We have inherited them, and we combine them in such a way as to produce an artistic result and a new result; combining them in such a way as to make proper intervals in the spacing of ornaments and the proper emphasis of different ornaments, and to keep the play of light and shade so as to make on the whole a pleasing design, and its merit would depend a great deal on how thoughtful and how different it was from the stereotyped combinations."

Now coming to the design under consideration, it is very difficult to put in words a description which so differentiates it from the prior art as to convey any vivid impression to one reading this opinion. This is largely due to the inherent difficulty of describing visual impressions in words, which is, of course, heightened where the person attempting it is without technical training in drawing or art. The nearest resemblance to the shower pan in suit is found in the so-called canopy No. 20,650 of Fensterer & Ruhe. This, from some points of view, is not dissimilar to the Holton design which the complainant sues to protect. When, however, the Holton shower pan is looked at, not from a side view, but directly, as would be the case if it were suspended as a shower pan, the difference between the two is very apparent and the superiority of the Holton design quite manifest. This is, I think, due to the concave portion of the shower pan next to the outer beading. The ribbed or melon effect of the convex portion is common, and the beading is common; but the prior designs have in a general way a plane surface mounting toward the apex of the melon, while in the Holton design it is broken by the circular trough.

Mr. Ainsworth has, I think, truly said:

"In holding that up, we get a shadow inside here, and then a high light, and then we get shadows again. It gives more play of light and shadow, whereas on this canopy the light strikes it full on this side."

If the Fensterer & Ruhe canopy had been an attractive design for shower pans, it would doubtless have been popular. As a matter of fact, however, the Holton pan has met with great commercial success and been sold by both complainant defendant and their customers in large numbers, while the Fensterer & Ruhe design has apparently

never been put out as a shower pan. This consideration is by no means controlling, but the commercial success of the Holton pan certainly tends to confirm my judgment that the design is novel and pleasing.

To quote from Mr. Ainsworth again:

"* * * That is the function of a design, from an artistic line, pleasing both to the eye, the intellect, and if possible pleasing to the emotions, and to make a pleasant impression."

Chief Justice Fuller said, in the case of Smith v. Whitman Saddle Co., 148 U. S. 679, 13 Sup. Ct. 770, 37 L. Ed. 606:

"If * * * the selection and adaptation of an existing form is more than the exercise of the imitative faculty and the result is in effect a new creation, the design may be patentable."

Judge Grosscup remarked, in the case of Pelouze Scale Mfg. Co. v. American Cutlery Co., 102 Fed. at page 916, 43 C. C. A. 52:

" 'Design,' in the view of the patent law, is that characteristic of a physical substance which, by means of lines, images, configuration, and the like, taken as a whole, makes an impression, through the eye, upon the mind of the observer. The essence of a design resides, not in the elements individually, nor in their method of arrangement, but in the tout ensemble—in that indefinable whole that awakens some sensation in the observer's mind. * * * But whatever the impression, there is attached in the mind of the observer, to the object observed, a sense of uniqueness and character."

It is, however, principally urged that Holton was not the inventor of the shower pan, because the Reliance Metal Spinning Company was given a rough sketch of a similar shower pan not drawn to scale by some customer early in 1913, and that from this sketch a plaster model was made in March, 1913; whereas, Holton's drawings were not made until May of that year.

In reply to my questions at the trial, the defendant's witness Samuel Shapiro said that he could not testify where he got the design, or who gave it to him, so that the defendant does not now claim to have itself originated it, yet Shapiro, in his affidavit to oppose the preliminary injunction in this suit, said:

"We have in our employ a designer who is constantly engaged in originating and contriving new and ornamental designs for the parts manufactured by us."

And further deposed:

"With regard to the particular design known as the Adams shower pan here at issue and shown in the cut attached thereto, that design was made by us as early as December, 1913."

[2] Furthermore, no shower pans were put on the market by the defendant until December, 1913, while the complainant put out some of them in June and July of that year. These fixtures of the complainant may have contained the design before the beading was changed, but that is, I think, unimportant. I am not satisfied with the defendant's explanation of its delay from the spring of 1913 to December of that year in putting out this new shower pan which has proved so successful commercially, and I am inclined to the belief

that the dies were not made until a much later date than some of the defendant's testimony would indicate. The defendant produced a number of witnesses who swore to the making of the plaster pattern and dies in the spring of 1913, but I do not think this testimony will bear a close scrutiny. It is to be borne in mind that a defense of a prior use, when introduced to invalidate an existing patent, must be established by the most convincing evidence. As the Supreme Court has said in the Barbed Wire Patent Case, 143 U. S. 284, 12 Sup. Ct. 447, 36 L. Ed. 154:

"* * * Courts have not only imposed upon defendants the burden of proving such devices, but have required that the proof shall be clear, satisfactory, and beyond a reasonable doubt."

Now, the strongest pieces of evidence which the defendant has offered, to corroborate the testimony of Samuel Shapiro that a plaster cast was made from the rough pencil sketch of the shower pan in March, 1913, and that a die was cast therefrom by the Fulton Foundry Company in April, 1913, were the testimony of the witness Baker, and the books of the foundry company. Baker picked out the die in court, and I think I saw on the plaster cast the indistinct number M 5779, which is the same number that appears in the books of the foundry company as applicable to a die pattern received by it from the defendant on April 8, 1913. Baker testified that he sold a hydraulic press to the defendant on March 21, 1913, and was within a month thereafter consulted because the die he identified in court was not producing satisfactory results when the press was applied to it.

Bazeel, one of defendant's witnesses, testified that he went back to work for the Reliance Metal Spinning Company "the last days of April," that he was "positively sure" of that date, and that he saw Cerveny make the plaster model. If this was true, it was not the plaster model sent to the foundry company on April 8, 1913. Moreover, Cerveny, who made the plaster die, said it was the second pattern he ever made for the Reliance Metal Spinning Company, and that it was a 16-inch pattern; whereas, he said the first one was an 18-inch Sheffield design. The books of the foundry company show that the plaster cast received April 8, 1913, was for an 18-inch die. It is difficult therefore to imagine that the die which Mr. Baker saw was for an Adam pan, and it was doubtless of the Sheffield design. The apparent number on the plaster cast for the Adam shower pan was so indistinct and irregular that it seems hard to reconcile such markings with any businesslike system which might have been adopted by the foundry company to identify the casts from which its dies are made.

Furthermore, Samuel Shapiro, and other witnesses, testified that the die which Baker says was giving trouble was so faulty that it was necessary to cut out the complete center and recast the piece so that it would give a proper impression; but Cerveny, who made the plaster cast, testified that the only trouble with the die was a small hole which he stopped with copper rivets and zinc, and that it always worked satisfactorily thereafter.

I think the facts to which I have adverted make it highly improbable, if not impossible, that the die which Baker examined was for an Adam shower pan. Mr. Baker doubtless intended to give a correct version of the facts, but his story is involved in so many inconsistencies with other testimony that I have reached the conclusion that the die he was consulted about was not for an Adam pan, but probably was for a Sheffield design. It is much easier for me to believe that the recollection of a man admittedly having no experience with matters of the kind in question was after three years mistaken as to the design he saw, than to reconcile the numerous contradictions which are involved in an acceptance of his story. The failure of Shapiro to remember where he secured the design, his attempt on the motion for a preliminary injunction to lead the court to believe that it was the invention of a designer of the defendant, and the further circumstance that the latter waited until eight or nine months after the die was made before putting the shower pan on the market, are all facts which discredit Shapiro's story.

But most of all does it seem unlikely that two designs could have been such exact counterparts of one another without deliberate copying. The fact that the beading on complainant's shower pan was changed some time after Holton's drawings were made because the original form of beading did not make a good impression upon the brass, and that defendant's shower pan is exactly like complainant's completed design after the beading was changed, makes it probable that the copying was done by the defendant from the Holton design. If the complainant had done the copying, the beading would not have been changed by it, for the defendant's design was never changed and also had the same beading as in complainant's final structure. Moreover, it is impossible to believe that the rough pencil sketch not drawn to scale which Shapiro says he received from some unknown customer should result in a shower pan resembling so exactly in every detail the final completed fixture of the complainant.

The questions of fact are difficult to resolve; but, after careful consideration, I have thought that the defendant has not sustained the burden of proof, and that Holton was the inventor of the design in suit.

[3] But the defendant further insists that the complainant is estopped to obtain either an injunction or damages because it did not follow up the Holton invention by applying promptly for a patent, but allowed more than a year to elapse after the defendant was putting out its shower pans without making its application. The statute "allows a patent to be granted only for an invention which was not in public use or on sale for more than two years prior to the application for the patent subject to the defense of abandonment within such two years. * * *" Andrews v. Hovey, 123 U. S. 275, 8 Sup. Ct. 101, 31 L. Ed. 160.

"But the use and sale of the invention within two years before the application for the patent was filed was not sufficient to establish an abandonment of the invention, because * * * Congress expressly authorizes the issue of a patent notwithstanding such use and sale." Mast, Foos & Co. v. Dempster Mill Mfg. Co., 82 Fed. 327, 27 C. C. A. 191.

The Supreme Court said, in the case of Bates v. Coe, 98 U. S. at page 46, 25 L. Ed. 68:

"Congress * * * interfered, and provided that no patent shall be held to be invalid by means of such purchase, sale, or use prior to the application of a patent, except on proof of abandonment to the public, or that such purchase, sale, or prior use has been for more than two years prior to such application."

In the case at bar the complainant did not at first know about the provision of law requiring it to apply for a patent within two years after public sale or use. When the provision was known, complainant applied for a patent and took steps to warn the trade. The law allowed two years within which to apply unless the invention was abandoned, and I think it clear that abandonment, which is a question of fact, never took place here. The defense of estoppel, therefore, cannot be sustained.

Last of all, the defendant asserts that the complainant has attempted to influence the testimony of Holton and to prevent him from being called by the defendant as a witness and should not prevail because it does not come into equity with clean hands. The letter of one of the complainant's officers to Holton, in which it is said, " * * * Please don't let them lead you off into space, etc., just say, 'I don't know,' or words to that effect," is certainly open to possible criticism. On the other hand, it can be construed as a caution to a witness on whom the complainant relied to prove its case not to be making ill-considered statements in regard to matters which happened three years before and of which the witness might not be certain without refreshing his recollection and referring to documents in the hands of the complainant. This litigation has been extremely bitter, and each party apparently became greatly excited. All this has tended to cause mutual distrust and promote the sort of thing which is now criticized. I cannot see, however, that the complainant secured, nor do I believe it attempted to secure, false testimony from Mr. Holton. The defendant doubtless knew that this court would not, by requiring answers to the usual interrogatories, compel the complainant to disclose the date of its invention, at least unless the defendant was required simultaneously to give similar information to the complainant. The defendant to secure the information which it could not get through interrogatories proceeded to examine Holton under section 863 of the Revised Statutes (Comp. St. 1913, § 1472), and the complainant thereupon became most anxious to prevent its adversary from securing the advantage of learning in advance of the trial the date when Holton claimed to have made his design. I am not satisfied that the letters to Holton disclose more than a desire to go over the documentary evidence and other facts with him before he should be called upon to testify, to warn him against volunteering information carelessly, and to have him avoid testifying until lawfully subpœnaed. The views of defendant's officers as to what was in law a valid subpœna, like the views of many laymen, were more prompted by self-interest than knowledge and are not to be taken seriously. In short, while the tone of the letters which are criticized does not in some respects commend itself, I think these letters were

the result of the excitement and zeal of an unusually bitter litigation, and not of any conscious desire to thwart justice, and I do not find that the complainant has acted so inequitably as to deprive it of the protection by a court of equity of the legal rights to which it became entitled as the owner of the patent in suit.

A decree is granted to the complainant, with costs, providing for an injunction and an accounting.

---

⊚⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes