**R. WALLACE & SONS MFG. CO. v. ELLMORE SILVER CO., Inc., et al.**

No. 2677.

United States District Court
D. Connecticut.

May 19, 1950.

Harrison F. Turnbull, New Haven, Conn., Wiggin & Dana, New Haven, Conn. (John Vaughan Groner, Fish, Richardson & Neave, Edwin Levisohn, Harry Cohen, Levisohn, Niner & Cohen, Byron L. Shinn, Lipper, Shinn & Keely, all of New York City, of counsel), for plaintiff.

Thompson, Weir & MacDonald, Herbert S. MacDonald, New Haven, Conn., Pennie, Edmonds, Morton & Barrows, Dean S. Edmonds, New York City (A. H. Golden, New York City, John T. Farley, New York City, of counsel), for defendant.

HINCKS, Chief Judge.

### Findings of Fact

1. This is an action charging infringement of Design Patent No. 126,117, issued to the plaintiff March 25, 1941 on the application of William S. Warren filed January 24, 1941.

2. The patent is directed to a "Design for a Spoon or Other Article of Flatware" and its single claim is "The ornamental design for a spoon or other article of flatware, substantially as shown." The patent drawing shows the front and rear view of a teaspoon and a cross-section of its upper handle.

3. The design of the patent is characterized by a plain stem which extends from the bowl substantially to the top of the spoon, coupled with a highly ornate head. The head is composed of three vertical decorated areas, the central one comprising, at the top, an acanthus, beneath which are a number of flowers, and depending from these is a pendant of flowers and leaves. The ornaments on either side of the stem comprise three major scrolls which extend almost half way down the stem. The first and third of these major scrolls has a concentric inner scroll, the area between them being unornamented. The topmost major scroll is the largest, the second and third being progressively smaller so that the outline of the head is essentially triangular. The largest and the smallest of the major scrolls are convex. The second scroll, while concave, is filled with flowers so that the effect of concavity is diminished. Bordering the inner scrolls and bordering the second major scroll is a line of fine beading, and adjacent to these beads are small piercings. Joining the largest scroll and the acanthus, and in a measure supporting the latter, is a small concave scroll, and beneath the third and smallest major scroll is another small concave scroll. At the junction of the stem and the bowl there is a small convex scroll above which is a smaller concave scroll, and on the stem are several small flowers and leaves, which extend into the bowl.

The back of the design is generally similar to the front except that the ornamentation overlying the center panel, or stem, comprises several small flowers grouped beneath the acanthus in the form of a pendant considerably shorter than its opposite number on the face. At the juncture of the stem and the bowl, the center ornamentation is omitted.

4. Mr. Warren, the plaintiff's patentee, in conceiving the design of the patent in suit created a pattern in the baroque principle representing a tree, the ornamented head, the plain stem, and the ornamentation at the base of the stem of the utensil respectively representing the branches and foliage, the trunk, and the roots of the tree. While this symbolism is not obvious, it contributes to the unity of the design.

5. The design of the patent in suit was conceived in 1940 and introduced to the market in 1941 under the name Grande Baroque. It immediately won an unusual degree of acceptance by the buying public. Despite the war and the resulting shortage of materials which commenced shortly after this pattern was introduced, and despite the fact that it commanded a price above the average for Sterling flatware, it has, since the date of its introduction, steadily increased in popularity. Since 1941 the plaintiff has sold in excess of two million individual pieces for about $7,000,000. Its sales for 1948 amounted to $1,700,000 and for 1949, partly on the basis of estimate, were equally substantial. (Sales figures are on the basis of wholesale prices.)

6. Sterling silver flatware patterns are regarded as successful by plaintiff's sales organization only when they maintain their appeal over a long period of time. This requirement for a successful pattern has been fulfilled by plaintiff's Grande Baroque.

7. Plaintiff's total advertising budget for 1949 ran to approximately $600,000 or $700,000. Of this amount more than half was allotted to the advertising of flatware which comprised many patterns of which at least five were dominant. In such advertising, the name as well as the appearance of each flatware pattern is emphasized. Grande Baroque is sold by the plaintiff through approximately 3,000 retail outlets comprising jewelry and department stores located throughout the United States. These stores are solicited by plaintiff's nationwide selling organization, and conduct flatware advertising of their own.

8. Silver flatware design is a highly crowded art: there are in evidence something like five thousand designs antedating

Warren. While innumerable earlier designs embody in varying combinations one or more of the decorative elements—scrolls, flowers, leaves, beading, and piercings, of Grande Baroque, none impart the same general impression as Grande Baroque and none is confusingly similar to Grande Baroque even to the layman's eye.

9. Appraised against the background of the prior art, Grande Baroque is striking and unique; it has qualities which place it, if not above, at least outside the scope of, the prior art; for its conception a degree of artistry and originality, and for its development and execution a degree of skill, were required beyond the range of the ordinary designer.

10. Defendant's accused pattern, called Botticelli, appeared on the market in the spring of 1949. For this pattern, U. S. Patent D-149,428, had been granted to the defendant on April 27, 1948 upon an application by Lipman who was defendant's president, but not a designer. The Warren patent in suit was cited as prior art by the Patent Office in issuing the Lipman patent.

11. There are a number of detail differences between defendant's commercial product of the Botticelli pattern and plaintiff's patented design,—i. e., its Grande Baroque pattern. Among these differences between the faces of the two patterns are the following: The largest set of double scrolls of Grande Baroque has plain surfaces between their concentric lines, whereas Botticelli, in this space, has a scalloping or shell treatment (on its face, but not its reverse). The second set of scrolls of Grande Baroque is concave, the concavity being filled with flowers, whereas the second set of scrolls of Botticelli is convex. The pendant at the top of Botticelli is not as long nor as graceful as on Grande Baroque. The acanthus of Grande Baroque flows rearwardly at its peak, whereas that of Botticelli tends to flow forwardly. Botticelli has no piercings corresponding to those of Grande Baroque but its corresponding surfaces are stamped thereby giving much the same effect. And whereas Grande Baroque has an entirely plain stem below the ornamental head, Botticelli has outline lines along the edge of the sides.

The back of Botticelli is at least as close as its front face in overall similarity to Grande Baroque. Its pendant is longer than the corresponding pendant of Grande Baroque and its upper scrolls, which on the face are chased instead of plain like those of Grande Baroque, on the reverse are plain and thereby closely resemble their counterparts on Grande Baroque.

On the other hand, the silhouettes of the two designs are very similar. Botticelli has, though to a lesser degree, and without the aid of piercings, a depth which gives some sense of perspective. It has, at least when viewed from a front elevation, convexity of outer perimeter. And the rear face of Botticelli (which was never shown to the Patent Office) in much of its detail, even more than its front face, resembles the front face of Grande Baroque.

All in all, and notwithstanding differences of detail, the arrangement of ornamental details, the spacing, the proportions, the contrasts between plain and chased surfaces have been worked into a unitary composition which makes Botticelli confusingly similar to Grande Baroque. The two patterns have substantially the same effect upon the eye, create much the same effect upon the mind, and are so similar as to confuse the average purchaser.

### Rulings on Evidence

At the trial, ruling was reserved on the defendant's offer of U. S. Patent Des. 149,-428. This was a patent granted to the defendant which covered its pattern now charged to infringe. It is now ordered that said patent be deemed to be in evidence. Upon that premise, the foregoing findings have been formulated.

### Conclusions of Law

[1] 1. Warren Patent Des. No. 126,-117 is owned by the plaintiff and is valid.

█ 2. Said patent has been infringed by defendant's flatware pattern known as Botticelli.

█ 3. The plaintiff is entitled to an injunction, to an accounting, and to costs.

## Opinion

The plaintiff has conceded throughout that there is nothing novel in the several elements of its so-called "Grande Baroque" patented design. They are the C-scroll, beaded and plain, the blossom, the acanthus leaf, and piercings interspersed. The claim of invention is rested squarely on the composition whereby these elements, each old in the art, are brought into a design which creates a sense of unity and is suffused with a beauty springing from a sense of life. The inventor himself has explained his design by the symbolism of the living tree with its plain, straight trunk surmounted by a mass of foliage symbolized by an extraordinary wealth of ornamentation and supported at its base by a short section which flares outwardly representing the roots as they enter the ground with a pointed tap-root penetrating well into the hollow of spoon and fork. Of course, the charm of such imagery may not serve as a substitute for patentable invention and, indeed, no such claim is made. The symbolism, however, is helpful I think for its capacity to describe the effect of the design which like any work of art having appeal either to eye or ear can only imperfectly be described in words.

On the disputed issue of validity, the plaintiff offered as witnesses, in addition to its designer, the author of the patent in suit, five executives of large and nationally known companies producing and selling flatware, all apparently competitors of the plaintiff, each of whom had prolonged and extensive experience in that field. Of these, a Vice-President of the Gorham Company, with fifty-six years' experience in the silver business, said that the pattern of the plaintiff's design at first glance impressed him as "an absolutely complete innovation in the field of flatware design": that it was "a very beautiful pattern * * * startling in its conception." Another, the managing director of Oneida, Ltd., a producer employing 4,000 persons, who in over twenty-five years had accumulated, as they came on the market, a collection of some 1100 spoons each of different design, spoke of plaintiff's design as "quite a new type of pattern, quite different from any pattern on our boards, quite original, and one that I thought had combined elements in a different fashion than any silverware pattern, Sterling or plate, that I had seen." The others characterized it as: (1) "very unusual in design and entirely different from any pattern that I had seen in the twenty years of my silver experience * * *" "very artistic, very unusual"; (2) "the most effective designing of magnificent motifs that I have ever seen in a Sterling flatware pattern * * * I don't recall seeing anything of its general character;" (3) "unique; (4) I hadn't seen anything like it before." A designer for one of these established producers called it one of the grandest patterns on the market. And two substantial retail merchants characterized the design as (1) "one of the most outstanding patterns that had ever been presented in the silver industry", and (2) when first seen as "so extreme and so different from any pattern that I had ever seen, that it was either going to be a flop or it was going to be a fortune."

In contrast with this evidence the defendant offered as a witness an importer and dealer in *antique silver* whose business comprised 99% hollow-ware and only 1% flatware (or about $1,000 worth of flatware per year) none of it later than Victorian, and who qualified as an expert for present purposes by answering as follows when counsel asked: (1) "Well, I suppose that you have been a student of design and silverware over some little time, have you not?" A. "Yes, I attended the art schools in London and I am a member of the Art and Antique League of America in New York City"; and (2) "I suppose that you have been a student of literature in silver design and have read rather widely in that field?" A. "I have, sir." The testimony of this witness was conspicuous—to me, at least—for the absence of expressed opinion that *the plaintiff's design* was within the range of the ordinary designer; instead he said only that the ordinary designer could select old elements, such as are involved here, or that a hired artist could take such elements as a member of

his employer's firm might direct, and then "sketch a nice pattern of a spoon using the old elements such as we have in the past."

The defendant did not call its President who, though concededly not a designer, as inventor signed the oath on the application which resulted in the grant to the defendant in 1948 of Des. 149,428 covering the Botticelli pattern which thus, like Botticelli's Venus, emerged from the foam after the continuing success of plaintiff's Grande Baroque had been thoroughly demonstrated. Nor was the absence of this witness explained. Instead, the defendant called as its only other witness its sales manager who testified that the Botticelli design "was developed within the organization" of the defendant company, and that the defendant employs designers who have the capacity on instructions "to get you up a design using these old items." In short, this witness, like the defendant's other witnesses, said in effect only that an ordinary designer could use old elements and therefrom produce an ordinary design.

From the foregoing summary of the testimony of the witnesses it clearly appears that there is a very substantial preponderance of evidence in support of Finding 9 and of the plaintiff's claim of invention. Having in mind, however, that the Judge's task is not fully performed if he swallows in a gulp the expressed opinions of others, I have proceeded without profession of any special competence to make my own examination of the plaintiff's design as it appears against the prior art and thus to reach an independent conclusion as to its patentability. About the standard which must control such a conclusion there can be no dispute: it is whether the design in question has "aesthetic skill", Friedley-Voshardt Co. v. Reliance Metal Spinning Co., D.C., 238 F. 800; whether the completed whole rises above the commonplace, Krem-Ko. Co. v. R. G. Miller & Sons, 2 Cir., 68 F.2d 872, 873; and whether the conception of the design required "some exceptional talent beyond the range of the ordinary designer

familiar with the prior art," Gold Seal Importers v. Morris White Fashions, 2 Cir., 124 F.2d 141, 142. Whether the design in suit satisfies that standard is indeed an impalpable question of great delicacy, a clear answer to which I have not found in the cited cases or any others. Although in this task I have deliberaterly attempted to insulate my mind both from what his opponent has called "the exuberance of advocacy" of plaintiff's counsel as well as from the charm of the inventor's imagery, nevertheless, I find the opinion of plaintiff's witnesses confirmed by the impressions made on my untutored eye and have concluded that this design does indeed involve invention.

I think the originality and charm of the pattern derives in part from the depth of the design. This is illustrated in the cross-section appearing as Fig. 3 of the patent. It is a feature which lends perspective and gives the pattern somewhat the distinction which sculpture, with its three dimensions, has over a painting or photograph with only two: it takes the pattern outside the ordinary run of "flatware". The feature of perspective is further emphasized by the contrasting overlay of the long attenuated pendant upon the strikingly plain surface of the stem. For it is apparent that the design is such that the pendant also, when interpreted with reference to the surmounting ornamentation as seen both in front elevation and in cross-section of the patent drawings, has substantial depth. The piercings further contribute to an impression of depth. Also the piercings coupled with the delicacy of the detail work and particularly with the fine beading or "raindrops" as the inventor called them, notwithstanding the mass of the aggregate ornamentation, give an impression of lightness and life. When these features are combined in striking contrast with the utterly plain shaft of the stem, with its upper extremity partially concealed, the composite effect is indeed much like that of a living tree, as the inventor suggests. The plain handle is well adapted to represent a stem or trunk with its tap root penetrating downward and its main shaft discharging the function of supporting a surmounting foliage-mass. The sur-

mounting mass creates the effect of foliage by the depth of the design, by its piercings, and by the partial glimpses of the upper trunk behind: these make it appear that light and air are passing through. And the globular shape of the foliage mass is further suggested by the convex outline of the outer perimeter which is readily discernible from the cross-section, Fig. 3. Although the several details of the design were all taken from the conventional art, they have been brought into a unitary composition which produces an effect so striking, so unique and yet so pleasing, as to qualify, in my judgment, as the work of invention.

The patent in suit was allowed over three references cited as typical of the prior art, viz.: Kintz Des. 94,906, Price Des. 100,878, and Koonz Des. 106,295. None of these shows or suggests a plain shaft supporting from the interior a mass of decoration giving the effect of surrounding foliage. On the contrary, all show a flat design with nothing effective to create the impression of partially obscured glimpses of a supporting trunk or of sky through the foliage. I fully agree with the Patent Office that the design in suit was a patentable advance over such art.

Nor is the effect of the plaintiff's design suggested by the button-hook handles, Schleckser Des. 28,552, and Saart Des. 31,225, or by the synthetic union of these designs, made for purposes of this trial, on which the defendant seems particularly to rely in support of its claims both of non-invention and of non-infringement. None of these shows any cross-section nor by other technique gives any suggestion of perspective, of depth or of lightness and life. Whether the "open field" which Schleckser designates as "o" is an incision transpiercing the design or a solid surface, its location in the center of the composition negatives the existence of any overlaid supporting stem and is as meaningless as a window in a chimney. The general effect of these designs is one of sumptuous display of expensive workmanship and material wholly devoid of the breath of life. A plaintiff's witness, Cayer, the only professional designer who was asked to testify, said of Schleckser that it was a "hodge podge" and a "meaningless array" of detail lacking unity and good design. I fully agree though conscious that my opinion adds little to the weight of that expressed by one so much better qualified in this field. And it occurs to me as something passing strange that in the field of this highly crowded art the defendant to support its claim of non-invention elected to place its chief reliance on designs which made their respective introductory curtseys at the Court of the Commissioner in 1899 and never since, either in the milieu of art or of commerce, have been seen again.

Aside from the reliance on Schleckser and Saart, and on the offspring from their artificial insemination, the claim of invalidity is supported only by vague generalities. Defendant's brief points to about a dozen other named designs in evidence from which it asserts plaintiff's design "derives". But this claim of *derivation* is confined to the observation that the several items of decoration found in plaintiff's design have all appeared in different arrangements before. This is obvious and has been freely conceded by the plaintiff throughout. Its reiterative mention here serves to highlight my conclusion that the vast panorama of the prior art which is in evidence contains no unitary design to which the defendant could justly point as creating by a similar arrangement of similar detail an impression essentially similar to the plaintiff's.

In addition to the dozen patterns just referred to the defendant invokes "the others in Exhibit 3 (said to contain 1100 illustrated patterns) and Exhibit 0-9 (containing 23 specimens of the prior art, mostly patented)". When defendant's counsel found in all this mass of material nothing further which deserved particular mention and discussion for its bearing on the issue of validity, surely I may be excused from extending my task.

If it were felt that the foregoing considerations left the issue of invention in doubt, I should feel that the evidence of commercial success should tip the scales in the plaintiff's favor. Sales of $7,000,000 (wholesale prices) over a scant nine-year period, during five of which materials and

market were restricted by war-time conditions, seems very substantial indeed. The high executive of a large competing concern spoke of this "remarkable" success and the "spectacular success in certain localities" on which he had reports. And even the defendant's brief acknowledged that the fact of "considerable sales" had factual support. While it is true that large sales are sometimes explained by lavish advertising there is no evidence that such was the case here. In 1949 something like $400,000 was appropriated to advertise all defendant's flatware which included at least five dominant patterns. In a highly competitive business such an expenditure cannot be classified as unusual and the large sales of Grande Baroque (estimated at $1,700,000 for 1949) cannot justly be attributed to the scale of advertising expenditure to the exclusion of popular appeal. The price of the product was considerably higher than almost all of its rivals, whether made by the plaintiff or its competitors. On the whole, I think that its success was attributable to a popular appeal which was evidential of something in the design decidedly out of the ordinary which should be classified as true invention.

On the issue of infringement the test, as long since stated in Gorham Mfg. Co. v. White, 14 Wall. 511, 20 L.Ed. 731, is whether "in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other." Further, the test is one to be applied to the design "as a whole." Dobson v. Dornan, 118 U.S. 10, 6 S.Ct. 946, 30 L.Ed. 63.

The defendant contends that this rule has been modified, at least in this circuit, by such cases as Dixie-Vortex Co. v. Lily-Tulip Cup Corp., 2 Cir., 95 F.2d 461, 467, in which it was said, "that every element of the design is essential," and Edison Electric Appliance Co. v. Fitzgerald Mfg. Co., 2 Cir., 32 F.2d 705, 706, wherein it was said that a patentee "who claims only the design 'as shown' is limited to substantially the form disclosed in his drawing." Such expressions, however, do not need to be interpreted as modifications of the Gorham rule. The substantial identity of the test of the Edison case was an express part of the Gorham rule. And the Dixie-Vortex pronouncement that "every element * * * is essential" means only that the broad disclosure made by a drawing, without specifications, cannot be limited to a part or "sub-combination" of the entire design. This interpretation of the terse pronouncement is confirmed by the fact that it cited as its authority only Ashley v. Samuel C. Tatum Co., 2 Cir., 186 F. 339, and American Fabrics Co. v. Richmond Lace Works, 2 Cir., 24 F.2d 365, 367. In the Ashley case, certainly the Gorham rule was not repudiated: there the court found non-infringement because there was "no likelihood that" the one design "could be mistaken for the other." [186 F.2d 343.] And the American Fabrics case (which, incidentally, furnishes strong support for the validity of the patent here in suit) as a test of infringement expressly adopts the Gorham rule: the court there found it inapplicable, however, because there the accused design was such as to "foreclose all reasonable chance of confusion of mistaking one design for the other" and because there was "no evidence of confusion."

Here the facts are very different. On this record there was significant evidence of actual confusion. This lends support to the direct and compelling circumstantial evidence of the likelihood of confusion. Indeed, the defendant's claim of non-infringement seems based not upon an absence of confusion but rather upon minor changes of detail and arrangement in the accused design. But as to this, the law does not require a plaintiff to show servile imitation in order to make out a case of infringement. And here the Botticelli pattern, though not a "Chinese copy", I find to be confusingly the same as Grande Baroque. Certainly it has a far closer affinity to Grande Baroque than to anything in the prior art. I hold it to be an infringement.

The plaintiff may submit a decree in accordance with the foregoing, on notice unless notice be waived.